**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **ERNESTO OJEDA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 5779** |
| | ) | |
| **RICHARD HARRINGTON, Warden,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

On February 17, 2005, Petitioner Ernesto Ojeda was convicted of first degree murder for shooting and killing Derrick Walton in 2000. Ojeda was sentenced to an aggregate term of sixty years. After unsuccessful appeals and post-conviction challenges to his conviction, Ojeda filed this petition for a writ of habeas corpus. His petition, as amended in January 2012, seeks relief on four grounds: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it excluded expert testimony about Petitioner's mental state at the time of the shooting; (3) on post-conviction review, appellate counsel was ineffective, and the appellate court denied his rights of access to the courts, due process, and equal protection; and (4) appellate counsel was ineffective on direct appeal. Respondent answered, arguing that the first three of these claims are not properly before the court, and that the state court reasonably applied the *Strickland* standard in dismissing Petitioner's claim of ineffective assistance of appellate counsel. For the reasons discussed below, Petitioner's habeas petition [20] is denied, and the court declines to issue a certificate of appealability.

## BACKGROUND

On July 8, 2000, Ernesto Ojeda shot and killed Derrick Walton. Ojeda was tried in the Circuit Court of Cook County, and convicted of first degree murder on February 17, 2005. (Trial Tr., Feb. 17, 2005, Ex. E to Answer [17], hereinafter "Trial Tr. 3," at 223:23–224:4; Order in

*People v. Ojeda*, No. 1-05-1652, 371 Ill. App. 3d 1205, 936 N.E.2d 1228 (tbl.) (1st Dist. 2007), Ex. B to Answer, hereinafter "App. Ct. Order," at 1.) Judge Dennis Porter sentenced him to thirty-five years for first-degree murder, and to twenty-five years for personal discharge of a firearm causing Derrick Walton's death, resulting in a total sentence of sixty years. (Order of Commitment and Sentence to Illinois Dep't of Corrections, Ex. A to Answer, at 1.)

## I.    Trial

At trial, Petitioner admitted to the murder, but argued that at the time of the shooting he held the unreasonable belief that he needed to act in self-defense. As a result, the only issue at trial was whether Petitioner was guilty of first or second degree murder. (Trial Tr., Feb. 15, 2005, Ex. C to Answer, hereinafter "Trial Tr. 1," at 4:13–18, 5:1–18; App. Ct. Order at 3.)

The prosecution presented the testimony of several eyewitnesses, including the victim's brother, Dwayne Walton; the victim's girlfriend, Yvette Smothers; and Drujuan Young. Dwayne Walton testified that on the evening of July 8, 2000, he was outside his home at 927 North Mozart Street with friends, including Derrick, eating pizza and drinking, when he saw Petitioner ride his bicycle north on the sidewalk past his home. (Trial Tr. 1 at 52:22–53:24; 56:2–5.) Dwayne Walton observed Ojeda turn around at the corner and ride his bicycle south on the sidewalk, again, past the Walton home. (*Id.* at 58:2–21.) Ojeda turned around a second time, Dwayne Walton testified, and this time rode his bicycle north on Mozart Street, stopped, and approached the group of people outside the Walton residence to ask whether they were "GDs," a reference to the Gangster Disciples street gang. (*Id.* at 59:1-3, 59:17–60:7.) Dwayne Walton responded "we're not on that," and Ojeda walked southwest across Mozart Street with his bicycle. (*Id.* at 63:20–64:15.) At this time, Dwayne Walton testified, Dwayne's brother Derrick Walton was across the street in front of Derrick's girlfriend's house. (*Id.* at 63:15–19.) As Ojeda walked his bicycle south down Mozart, Derrick Walton followed, walking behind Ojeda. (*Id.* at 64:8–18; 65:1–12.) When Ojeda and Derrick were about two feet apart, Dwayne Walton saw Ojeda lay his bicycle down on the ground and turn around with a gun in his hand. According to

Dwayne Walton, after seeing the gun, Derrick turned and tried to run northeast between two parked cars, but Ojeda fired the gun and Derrick fell to the ground. (*Id.* at 66:18–67:20; 68:16–22; 69:3–70:13; 71:1–6; 76:4–10.) Then, Dwayne Walton testified, Ojeda walked from the sidewalk where he was standing on the west side of Mozart Street, to the curb between two parked cars and began to fire his gun at the group of people near the Walton residence. (*Id.* at 71:10–72:6.) Dwayne Walton did not see a gun or other weapon in the possession of Derrick or anyone else, nor did he hear any conversation between Ojeda and Derrick or observe Derrick make any threatening gestures towards Ojeda. (*Id.* at 74:18–76:3.)

Yvette Smothers, Derrick Walton's girlfriend, testified that on the evening of July 8, Derrick Walton had been at her house at 928 North Mozart Street, but had crossed the street to talk to the group outside his home at 927 North Mozart Street. Derrick was returning to her home when Ojeda rode past Derrick on his bicycle. (Trial Tr. 1 at 129:8–14, 129:24–130:11, 131:4–22.) After he passed Derrick, Smothers testified, Ojeda got off his bike and laid it on the ground. (*Id.* at 131:18–22, 132:2–6.) Both Ojeda and Derrick were on the west side of Mozart Street, facing south, according to Smothers, when Ojeda, who was just a few steps in front of Derrick, reached for something and turned around. (*Id.* at 131:23–132:1, 132:7–10, 133:4–9.) Smothers called out to Derrick, and Ojeda fired the gun. (*Id.* at 133:4–13.) Smothers testified, as Dwayne Walton did, that Derrick tried to run, but slipped, and that after shooting Derrick, Ojeda began to fire northeast at the group of people across the street. (*Id.* at 134:3–11, 135:5–136:5.) Smothers testified that Derrick was unarmed, and that she did not hear any conversation between Derrick and Ojeda before the shooting. (*Id.* at 136:20–137:8.)

Drujuan Young provided testimony similar to that of Dwayne Walton and Yvette Smothers. Young added the information that "a minute or two minutes" before Ojeda first rode by the group outside the Walton residence on his bicycle, Young observed a dark-colored car slowly drive past the house, with Ojeda seated in the back. (*Id.* at 100:23–103:24.) Like both Dwayne Walton and Smothers, Young testified that Derrick was unarmed. (*Id.* at 111:7–16.)

3

The prosecutor called Cook County Deputy Medical Examiner, Dr. Aldo Fusaro, who testified that Derrick Walton was killed by "a complex single gunshot wound to the back of the right shoulder." (Trial Tr., Feb. 16, 2005, Ex. D to Answer, hereinafter "Trial Tr. 2," at 4:16–18; 10:11–14.) Based on the wound's angulation, Dr. Fusaro concluded that Derrick Walton was likely bent over when he was shot. (*Id.* at 21:15–22:12.) Chicago Police Department Forensic Investigator James Shader testified that in the early morning of July 9 he "recovered nine 9-millimeter cartridge cases that were on the street and on the parkway and on the sidewalk in front of 914 North Mozart." (*Id.* at 59:12–18; 61:22–62:20; 65:4–12.)

The State also offered the testimony of Chicago Police Detective Michael Hammond, and Assistant State's Attorney Diedre Cato, each of whom took a statement from Ojeda when he was arrested on November 2, 2000. Detective Hammond testified that in his post-arrest statement, Ojeda "acknowledged that he shot the victim." (Trial Tr. 2 at 96:24–97:23, 100:13–17.) Ojeda told Detective Hammond that when Ojeda asked the group of people whether they were "GDs," Derrick had responded "no, we're Vice Lords" and told Ojeda to "[g]et the fuck off our corner, bitch." (*Id.* at 101:14–24.) Ojeda told Detective Hammond that he "exchang[ed] words" with Derrick, warned Derrick that he would be back, and began to walk across Mozart street with his bike. (*Id.* at 101:24–102:1.) Ojeda told Detective Hammond that though he repeatedly warned Derrick not to follow him, Derrick persisted, and that is when Ojeda pulled out his gun and shot Derrick. (*Id.* at 102:2–13.) Ojeda admitted to Detective Hammond that after shooting Derrick, he fired his gun at the group of people on Mozart Street until he ran out of bullets. (*Id.* at 102:9–13.) Ojeda also gave a videotaped statement, which was shown to the jury. In that statement, which is consistent with the account repeated by Detective Hammond, Ojeda claimed that after Derrick told him to leave, he felt both "scared" and "mad" because the victim had "disrespected [him] in front of a lot of people outside." (*Id.* at 131.) After Ojeda left the group of people, Ojeda recounted, Derrick followed him, telling him that "this ain't over" and challenging Ojeda to a fight "one on one." (*Id.* at 132.) Though Derrick alone followed him,

4

Ojeda said that he told Derrick he did not want to fight in the presence of others because "I can get all beat up by everybody, you know." (*Id.* at 132–33.) Ojeda admitted that he saw nothing in Derrick's hands at the time, that Derrick tried to run away, and that he intentionally fired the gun at Derrick. (*Id.* at 135–36.) He also admitted that after shooting Derrick he continued to fire the gun "[u]ntil the gun stopped. Until the gun had no more bullets." (*Id.* at 137.)

Petitioner Ojeda took the stand at trial and gave testimony similar to the statements he made to Detective Hammond and Assistant State's Attorney Cato. Ojeda denied riding in a car past the Mozart residence earlier in the day (Trial Tr. 3 at 12:17–13:1), but admitted to approaching the group on his bicycle and asking whether they were "GDs." (*Id.* at 15:6–14.) After Derrick told him to leave, Ojeda testified that he felt "[r]eal scared and nervous." (*Id.* at 16:10–11.) When Derrick then followed him across Mozart Street and challenged Ojeda to fight "one on one," Ojeda testified that he was afraid that Derrick and his friends would "jump[]" and kill him." (*Id.* at 16:15–20, 16:24–17:20.) Ojeda repeated that he "felt real scared," and that when he asked Derrick to stop following him, Derrick repeated that they should fight "one on one." (*Id.* at 17:21–22, 18:5–10.) At this point, Ojeda testified, he pulled the gun out, turned around, aimed and fired at Derrick. (*Id.* at 18:11–13, 19:6–8.) Ojeda admitted that, at the time he shot Derrick, Derrick tried to run away. (*Id.* at 34:16–24.) He also acknowledged that he was a member of the "Dragons" gang at the time of the shooting. (*Id.* at 14:22–15:5.)

When asked why he fired, Ojeda responded that "[a]t first, I tried to scare him away, but I noticed the gun had went off. It wasn't on safety." (*Id.* at 19:9–11.) During his testimony, Ojeda stated that he had never fired a gun before, and repeated at least twice more that he did not think that the gun would fire because he thought the safety was on. (*See id.* at 18:14–19:4; 26:15–23; 32:13–17.) He explained that he carried the gun with him because of the number of gangs in his neighborhood, and because, he testified, "I have a problem leaving my house . . . . Because I have a problem with anxiety and nervousness. The gun made me feel safe." (*Id.* at 13:21–14:2; 14:12–17.) And, when asked what happened after he fired and why he fired the

5

gun so many times, Ojeda testified repeatedly that "[i]t happened so fast." (*Id.* at 19:21, 20:2.) He thought he had a panic attack, Ojeda testified, when he fired the gun. (*Id.* at 20:6–9.) Ojeda admitted, however, that Derrick was unarmed, and that the biggest threat he faced was Derrick's invitation to finish the disagreement "one on one." (*Id.* at 28:20–29:1.) Nor did he see anyone in the group of people on Mozart Street with a weapon. (*Id.* at 23:16–24:13.)

Ojeda also offered the testimony of Dr. Diane Goldstein as an expert in psychology and neuropsychology. (*Id.* at 91:20–23.) Dr. Goldstein testified that she performed psychological and neuropsychological (or cognitive) tests on Ojeda over the course of four half-day meetings, and reviewed Ojeda's school and psychiatric treatment records as well as records related to this case. (*Id.* at 92:21–93:21; 94:1–15.) Based on this data, Dr. Goldstein concluded that Ojeda suffered from generalized anxiety disorder and social phobia as well as substance abuse problems. (*Id.* at 107:5–23.) Dr. Goldstein explained that generalized anxiety disorder is characterized by "excessive chronic worry," and that social phobia is more specific, and "ha[s] to do with persistent fears in a social performance situation, or in a social interaction situation." (*Id.* at 108:1–6; 110:10–17.) People with social phobia, Dr. Goldstein continued, also suffer from "very poor social skills." (*Id.* at 111:10–16.) Dr. Goldstein explained that a person with such an anxiety disorder would misperceive a threat, because "[b]y definition, people who have anxiety disorders see a bear there when there isn't one. They . . . either create a threat where there is none or misperceive the amount of threat. So . . . it's always a flight or fight response when there need not be." (*Id.* at 112:1-6; 113:17–23.) Based on her review of Ojeda's records, Dr. Goldstein testified that Ojeda likely suffered from anxiety disorders before July 2000. (*Id.* at 113:24–114:8.) Ojeda's attorney sought to introduce Dr. Goldstein's opinion concerning Ojeda's

state of mind at the time of the shooting, as well. Citing Illinois case law,[1] however, the trial court excluded that testimony. (Trial Tr. 1 at 3:12–5:4; App. Ct. Order at 2–3.)

The jury found Ojeda guilty of first degree murder. (Trial Tr. 3 at 223:23–224:4.)

## II.   Direct Appeal

On direct appeal, represented by Kerry Goettsch from the Office of the State Appellate Defender, Petitioner raised three issues: (1) the state failed to rebut evidence that Petitioner acted in self-defense, and therefore, did not prove him guilty of first degree murder beyond a reasonable doubt; (2) the trial court erred when it excluded Dr. Goldstein's testimony concerning Petitioner's mental state at the time of the shooting; and (3) the sentence imposed was excessive. (Br. & Argument for the Def.-Appellant in *People v. Ojeda*, No. 1-05-1652, Ex. F to Answer, hereinafter "Pet'r's App. Br.," at i–ii, 1.) The Illinois Appellate Court affirmed Petitioner's conviction and sentence on March 29, 2007. (App. Ct. Order at 2.)

First, the court reasoned that reversal of a conviction was appropriate only where evidence was "so improbable or unsatisfactory that there is reasonable doubt as to the defendant's guilt." (App. Ct. Order at 11) (citing *People v. Williams*, 193 Ill. 2d 306, 338, 739

---

[1]     In *People v. Elder*, 219 Ill. App. 3d 223, 579 N.E.2d 420 (3d Dist. 1991) and *People v. Raines*, 354 Ill. App. 3d 209, 820 N.E.2d 592 (4th Dist. 2004), Illinois appellate courts upheld limitations on defense expert testimony in first-degree murder trials. The trial court in *Elder* permitted the defense expert to testify about "the tests he conducted on the defendant, the results of those tests, and his opinions concerning the defendant's personality," but prohibited testimony on the defendant's state of mind at the time of the offense, reasoning that this testimony was within jurors' common understanding. The Illinois Appellate Court agreed; noting that expert testimony on this matter was admissible only where "the subject is difficult to comprehend and explain," the court pointed out that "a jury is capable of determining whether the defendant was acting under a sudden and intense passion as a result of serious provocation." 219 Ill. App. 3d at 225-26, 579 N.E.2d at 421. Similarly, in *Raines*, the trial court barred the defense expert from testifying to the defendant's state of mind at the time of the shooting, but allowed testimony concerning the tests the expert performed on the defendant, and her conclusions. 354 Ill. App. 3d at 209, 820 N.E.2d at 595. The Illinois Appellate Court affirmed, pointing out that the "[t]he question of a defendant's state of mind at the time of the crime is a question of fact to be determined by the jury," and that the proposed testimony was not needed to explain evidence beyond the jurors' common knowledge. 354 Ill. App. 3d at 220–21, 820 N.E.2d at 601–02 (quotations omitted).

N.E.2d 455, 472 (2000).) To prove that the defendant was "justified" in the use of force for self-defense, the court observed, the defendant must provide "some evidence" of each of the following six elements: "(1) force was threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) defendant actually and subjectively believed a danger existed that required the use of force applied; and (6) defendant's beliefs were reasonable." (*Id.* at 12) (citing *People v. Morgan*, 187 Ill. 2d 500, 533, 719 N.E.2d 681, 700 (1999).) Only after the defendant provides evidence of each of the six elements does the burden of proof shift to the State to prove that the defendant did not act in self-defense. (*Id.*) But, citing *People v. Jeffries*, 164 Ill. 2d 104, 128, 646 N.E.2d 587, 598 (1995), the Illinois Appellate Court reasoned that the State could defeat a self-defense claim by negating any one of the six factors. (*Id.*)

The Appellate Court found "no evidence" to support Petitioner's argument "that he subjectively believed that he was acting in self-defense." (App. Ct. Order at 13.) As to the first element—a threat of force against Petitioner—Petitioner testified that the biggest threat was Derrick's statement to him that they should finish their disagreement "one on one." (*Id.*) Petitioner's post-arrest statements and his testimony confirmed that he understood Derrick to be challenging him to a fist fight, and that he knew that Derrick was unarmed. (*Id.*) Nor did Petitioner offer evidence that he was not the aggressor; rather, the court found it "significant[]" that "all of the eyewitnesses, including [Petitioner], testified that Derrick turned and attempted to run away from [Petitioner] when [Petitioner] shot him in the back." (*Id.*) The court noted, further, that Petitioner admittedly "continued shooting until his gun was empty, firing several shots at the crowd across the street." (*Id.* at 14.) Additionally, while Petitioner testified that he was afraid of the group of people across the street, he acknowledged that the group was not near him when he shot Derrick. (*Id.* at 13.)

Far from supporting Petitioner's claim of self-defense, the court concluded the evidence established the opposite—"that [Petitioner] was the aggressor, that Derrick never threatened

[Petitioner], and that Derrick retreated and did not have a weapon so there was no danger of immediate harm to the defendant." (App. Ct. Order at 14.) Finally, the court observed that Petitioner's testimony that he drew the gun only to "scare" Derrick, and thought that the safety was on when he pulled the trigger, further undermines a claim of self-defense as it "implies that the shooting was an accident, not that [Petitioner] acted in self-defense." (*Id.*)

The court also rejected Petitioner's challenge to the trial court's refusal to permit Dr. Goldstein to testify about Petitioner's state of mind at the time of the shooting. The court reasoned that admission of testimony is within the discretion of the trial court, and the trial court's decision is reversible only where the error was material to the trial or prejudicial to the defendant. (App. Ct. Order at 14–15.) As a defendant's state of mind at the time of the offense is a question of fact for the jury, a court may permit an expert to testify about this issue only where it may assist the jury. (*Id.* at 15.) In this case, the court concluded, the jury was capable of determining whether Petitioner believed that he needed to act in self-defense—Petitioner and all three eyewitnesses testified about Petitioner's conduct and the circumstances surrounding the shooting, "[Petitioner's] testimony did not vary substantially from that of the State's eyewitnesses," and Petitioner testified specifically about his state of mind at the time of the shooting. It was not an abuse of discretion, the court concluded, to exclude Dr. Goldstein's testimony on this issue. (*Id.*)

Finally, the court affirmed Petitioner's sentence, rejecting Petitioner's argument that the trial court improperly focused only on retribution and did not consider the relevant mitigating factors. (App. Ct. Order at 15–17.) The court noted that the "most important factor" at sentencing is the "seriousness of the offense"—in this case, the fact that the "defendant pulled a gun on an unarmed person and just shot him down, which is a matter of significant concern to the Court." (*Id.* at 16–17) (quoting sentencing court.) The record showed that the sentencing court did consider the mitigating evidence presented but concluded that the seriousness of the offense warranted a stiff sentence. (*Id.*) The Appellate Court found no abuse of discretion in

Petitioner's sentence of thirty-five years for murder (where the statutory range was 20 to 60 years) and twenty-five years for personal discharge of a firearm causing the death of another (the bottom of the range of 25 years to natural life). (*Id.*)

Petitioner appealed to the Illinois Supreme Court *pro se*, raising the same three issues. (Pet. for Leave to Appeal in *People v. Ojeda*, No. 11888, Ex. I to Answer, hereinafter "Pet'r's PLA.")  The Illinois Supreme Court denied leave to appeal on November 29, 2007.[2] *People v. Ojeda*, 226 Ill. 2d 601, 879 N.E.2d 936 (tbl.) (2007). Petitioner then filed a petition for *certiorari*, which was denied by the United States Supreme Court on April 28, 2008. (Answer ¶ 20; *Ojeda v. Illinois*, 553 U.S. 1021 (2008).)

## III.    Post-Conviction Review

Petitioner filed a *pro se* post-conviction petition with the Circuit Court on November 5, 2008, raising the following issues: (1) he was denied a fair trial at the jury selection stage and in the prosecutor's closing; (2) his trial counsel was ineffective; and (3) his appellate counsel was ineffective for failing to raise each of these claims as plain error. (V. Pet. for Post-Conviction Relief in *People v. Ojeda*, No. 00-CR-28242, Ex. L to Answer, hereinafter "Pet'r's Post-Conviction Pet.," at 3, 7–8, 14, 36, 46–48.)  Petitioner identified seven instances of improper remarks during closing and rebuttal, including the prosecutor's references evidence concerning gangs and to Petitioner's gang affiliation, his use of the term "truth detector" to refer to the testimony of several of the State's witnesses, and of the phrase "we know" and "tell us"[3] in his

---

[2]    The Illinois Supreme Court granted Petitioner leave to file a late petition for leave to appeal (PLA), deeming his PLA timely filed on September 14, 2007. (Answer [17] ¶ 19.)

[3]    During closing arguments, both the prosecutor and defense counsel used the phrase "we know" to summarize evidence that had been presented to the jury. (Trial Tr. 3 at 147:18–19, 163:7–11) ("We know for sure there were at least nine shell casings" [prosecutor]; "We know that this shooting occurred essentially somewhere around where the shells were located by the forensic investigator . . . ." [defense counsel].)  The prosecutor used the phrase "tell us" in a similar way. (Trial Tr. 3 at 154:10–11; *see also id.* at 154:22) ("What else does Dwayne tell us?  Dwayne says . . . .")

closing argument. (Pet'r's Post-Conviction Pet. at 14–36.) The cumulative effect of these errors, Petitioner urged, denied him a fair trial. (*Id.* at 35–36.) The Circuit Court summarily dismissed[4] the post-conviction petition on January 30, 2009. (Order in *People v. Ojeda*, No. 00-CR-28242 (Cir. Ct. Cook Cnty. Jan. 30, 2009), Ex. M to Answer, hereinafter "Cir. Ct. Post-Conviction Order.")

The Circuit Court held, first, that Petitioner's claims concerning the fairness of jury selection, arguments made by the prosecutors during closing and rebuttal, and ineffective assistance of trial counsel, were all barred under the waiver doctrine because Petitioner failed to raise them on direct appeal. (Cir. Ct. Post-Conviction Order at 4.) In any event, the court noted, these claims were "frivolous" and/or "without merit," so appellate counsel was not ineffective for failing to raise them. (*Id.* at 4–18.)

Petitioner appealed. Through appointed counsel, he argued only that appellate counsel was ineffective for failing to raise the issue that the prosecutor's closing arguments denied Petitioner a fair trial. (Br. & Argument for Pet'r-Appellant in *People v. Ojeda*, No. 1-09-0676, Ex. N to Answer, hereinafter "Pet'r's Post-Conviction App. Br.," at i.) Specifically, Petitioner argued that he raised the gist of a constitutional claim that appellate counsel was ineffective for failing to challenge the following remarks made by the prosecutors during closing: (1) repeated (twenty-two) references to Petitioner's gang affiliation; (2) use of the term "truth detector" to "vouch[] for the credibility" of testimony given by the State's occurrence witnesses; and (3) repeated use of the phrases "we know" and "tell us" to "align[] themselves with the jury and inject[] their personal

---

[4]        There are three stages to post-conviction review, and during the first stage the circuit court examines the petition, independent of any pleadings from the State, to determine "whether the allegations in the petition, liberally construed and taken as true, set forth a constitutional claim for relief." *People v. Hommerson*, 378 Ill. Dec. 459, 461, 4 N.E.3d 58, 60 (Ill. 2014). If the court finds the petition to be "frivolous or . . . patently without merit," then it will dismiss the petition. *Hommerson*, 378 Ill. Dec. at 460–61, 4 N.E.3d at 59–60. Though such a ruling is referred to as a "summary" order, the Post-Conviction Act requires a court dismissing a petition in this first stage to issue "a written order, specifying the findings of fact and conclusions of law it made in reaching its decision." 725 ILCS 5/122-2.1(b).

opinions." (Pet'r's Post-Conviction App. Br. at 13–14.)  After his appointed counsel had filed the opening appellate brief and the State filed an answer, Petitioner moved to strike appellate counsel's brief and proceed *pro se* because he wanted to include additional claims dismissed by the lower court. (Mot. to Strike Appellate Counsel's Br.; To Establish a New Briefing Schedule; and, To Allow Appellant to Proceed on Appeal *Pro Se*, in *People v. Ojeda*, No. 1-09-0676, Ex. O to Answer, hereinafter "Pet'r's Mot. to Strike," at 7–8.)  The Appellate Court denied that motion, however, and addressed only the claim of ineffective assistance of appellate counsel. (Order in *People v. Ojeda*, No. 1-09-0676 (Ill. App. Ct. – 1st Dist. May 7, 2010), Ex. P to Answer.)

The Appellate Court rejected that claim, concluding that Petitioner had not been prejudiced by his appellate counsel's failure to raise the issue of prosecutorial misconduct on direct appeal. (Order in *People v. Ojeda*, No. 1-09-0676 (Ill. App. Ct. 1st Dist. Nov. 10, 2010), Ex. S to Answer, hereinafter "App. Post-Conviction Order," at 1.)  Petitioner's gang membership was relevant, the court noted, because Petitioner testified that he was in a gang, carried a gun because of the presence of gangs in his neighborhood, and approached the group on Mozart Street and asked them whether they were "GDs." (*Id.* at 8–9.)  This question sparked a "verbal exchange" between the victim and Petitioner concerning gangs, in which the victim responded "We are Vice Lords" and told Petitioner to leave. (*Id.* at 9.)  The shooting happened soon thereafter.  The court concluded: "Given this series of events, the prosecutors would have been hard pressed to summarize the evidence in closing arguments without mentioning gangs or gang membership." (*Id.*)  The court also considered Petitioner's argument that some of the prosecutor's references to his gang affiliation were unsupported by the record, specifically the prosecutor's statement that Petitioner and "fellow Dragon gangbangers" were circling the block and looking for "trouble" with Gangster Disciples. (*Id.*)  Those references "were not completely without evidentiary support," the court reasoned, and the trial court's instruction to the jury that closing arguments are not evidence and that the jury should disregard unsupported statements cured any error. (*Id.* at 9–10.)

With respect to the prosecutor's use of the term "truth detector" to describe the testimony of the state's eyewitnesses, the court noted that vouching for a witness's credibility is improper only where the prosecutor explicitly presents his own personal view. (App. Post-Conviction Order at 10.) As the prosecutor did not do so here, the prosecutor's description of "truth detector[s]" within each of the witnesses' testimony was not improper. (*Id.*) Nor was the prosecutor's repeated use of the phrase "we know" or references to what the witnesses "tell us" improper as, the court noted, such expressions are commonly used to summarize evidence, and the phrase "we know" was used in the defense closing, as well. (*Id.* at 11.) In any event, the claim of prosecutorial misconduct was not reviewable as plain error, the court observed, because the evidence was not close, nor were any of the errors serious. (App. Post-Conviction Order at 12.) The Appellate Court concluded that Petitioner's claim that appellate counsel was ineffective for failing to raise this issue "is indisputably meritless." (*Id.* at 12–13.) Petitioner sought rehearing, but the Appellate Court denied it. (Order in *People v. Ojeda*, No. 1-09-0676 (Ill. App. Ct. 1st Dist. Dec. 17, 2010), Ex. T to Answer.)

In a petition to the Illinois Supreme Court, Petitioner repeated his claim that his appellate counsel was ineffective for failing to challenge the prosecutor's closing argument. (Pet. for Leave to Appeal in *People v. Ojeda*, No. 111842, Ex. U to Answer, hereinafter "Pet'r's Post-Conviction PLA.") Petitioner also argued that his rights to "access to the court," due process, and equal protection were denied in the post-conviction review proceedings because his post-conviction appellate counsel was ineffective and the appellate court had denied him leave to strike appellate counsel's brief and proceed *pro se.* (Pet'r's Post-Conviction PLA at 20.) The Illinois Supreme Court denied Petitioner's leave to appeal on March 30, 2011. *People v. Ojeda*, 350 Ill. Dec. 870, 949 N.E.2d 662 (tbl.) (2011).

IV. **Habeas Petition**

Petitioner raises four issues in his Habeas Petition: (1) the State failed to rebut evidence that Petitioner acted in self-defense, and therefore, failed to prove him guilty beyond a

reasonable doubt; (2) the trial court erred in excluding expert's testimony about Petitioner's mental state at the time of the shooting; (3) on post-conviction review, (a) post-conviction appellate counsel was ineffective for failing to appeal all issues summarily denied by the Circuit Court, and (b) the Appellate Court denied his rights of access to courts, due process and equal protection by not permitting him to proceed *pro se*; and (4) on direct appeal, appellate counsel was ineffective for failing to raise a prosecutorial misconduct claim. (Am. Habeas Pet. [20] at 5–6.)

**DISCUSSION**

## I.      Standard of Review

Under 28 U.S.C. § 2254, a court may issue a writ of habeas corpus for a person in custody pursuant to a state court judgment only where that person "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Before a court considers a habeas application, the petitioner must have exhausted his remedies in state court by fairly presenting the claims through one complete round of review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A claim is fairly presented where the "petitioner alerted the state court to the federal nature of his claim in a manner sufficient to allow that court to address the issue on a federal basis." *Crockett v. Hulick*, 542 F.3d 1183, 1192–93 (7th Cir. 2008).  In deciding whether a petitioner has fairly presented his claim in state court proceedings, the court may consider

> whether the petitioner (1) relied on relevant federal cases applying constitutional analysis; (2) relied on state cases applying federal constitutional analysis to a similar factual situation; (3) asserted the claim in terms so particular as to call to mind a specific constitutional right; and (4) alleged a pattern of facts that is well within the mainstream of federal constitutional litigation.

*White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009).  "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004)).  For any claim on which

the petitioner has exhausted state court remedies, and is not procedurally defaulted, the federal court may reach the merits, but will issue the writ only where the state court judgment "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

## II.    Claim 1

In his first ground for relief, Petitioner argues that because the State did not rebut evidence that Petitioner acted in self-defense, the State failed to prove him guilty of first degree murder beyond a reasonable doubt. (Am. Habeas Pet. at 5, 6(A).) Petitioner contends that he proved by a preponderance of the evidence that he had an unreasonable belief in the need for self-defense, such that the burden of proof shifted to the State to rebut his self-defense theory. (*Id.*) As the State failed to rebut that theory, he concludes, his conviction should be reduced to second degree murder. (*Id.*) Respondent concedes Petitioner exhausted this claim on direct appeal (Answer at 15), but argues that the claim is not cognizable on habeas, and that the prosecution's burden is to prove all elements of the offense of first degree murder beyond a reasonable doubt, and not to disprove mitigating factors. (*Id.* at 15–16.)

The due process clause requires the State to prove each *element* of a charged offense beyond a reasonable doubt before a defendant may be convicted. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). Where a petitioner challenges the sufficiency of the evidence used to secure a conviction on habeas, the petitioner must show both that "no rational trier of fact could have agreed with the jury," and that the state court decision rejecting a sufficiency of the evidence challenge was "objectively unreasonable." *Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012). Whether the State must also disprove affirmative defenses depends "on the manner in which the State defines the charged crime." *Engle v. Isaac*, 456 U.S. 107, 120 (1982) (citing, for comparison, *Mullaney v. Wilbur*, 421 U.S. 684 (1975), and *Patterson v. New York*, 432 U.S. 197 (1977)). In *Mullaney*, the Court considered a Maine statute that required a defendant charged

with murder to prove, by a preponderance, that he acted in the heat of passion on sudden provocation, in order to reduce the conviction to manslaughter. 421 U.S. at 703–04. Though Maine law required the State to prove that the defendant acted intentionally or with criminal recklessness, the Court concluded it improperly shifted that burden by requiring the defendant to prove the *absence* of heat of passion on sudden provocation. *Id.* at 691, 697–98. In contrast, the Court upheld a state statute in *Patterson* that placed the burden of proof for an affirmative defense on the defendant because, it reasoned, the elements of the affirmative defense, if proven, did not negate any elements of the charged offense, and therefore did not violate the due process clause. 432 U.S. at 206–07.

Under Illinois law, second degree murder is defined as "the offense of first degree murder" where a mitigating factor is present. 720 ILCS 5/9-2(a). A person commits first degree murder when the person "kills an individual *without lawful justification*" and "in performing the acts which cause the death," that person has the requisite intent or knowledge that his acts will kill or cause great bodily harm, or commits or attempts to commit a forcible felony. 720 ILCS 5/9-1(a) (emphasis added). As the Illinois Supreme Court explained in *People v. Jeffries*, 164 Ill. 2d 104, 646 N.E.2d 587 (1995), second degree murder is "a *lesser mitigated offense* of first degree murder"—"lesser" "because its penalties upon conviction are lesser," and "mitigated" "because it is first degree murder *plus* defendant's proof by a preponderance of the evidence that a mitigating factor is present." 164 Ill. 2d at 122, 646 N.E.2d at 595 (citing *People v. Newbern*, 219 Ill. App. 3d 333, 579 N.E.2d 583 (4th Dist. 1991) (emphasis in original).

While the State always retains the burden of proof to prove all elements of first degree murder, the accused may defend a first degree murder charge by showing that he acted in self-defense. Illinois law distinguishes between two theories of self-defense in a first degree murder case—the first theory, justifiable self-defense, is a complete affirmative defense; the second, unreasonable self-defense, is a mitigating factor that will lessen the offense from first degree to second degree murder. *See* 720 ILCS 5/7-1(a) (justifiable self-defense); 720 ILCS 5/7-14

(justifiable self-defense affirmative defense); 720 ILCS 5/9-2(a)(2) (unreasonable self-defense).

Section 9-2(c), which defines second degree murder, explains the burdens of proof:

> When evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. *The burden of proof, however, remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code.*

720 ILCS 5/9-2(c) (emphasis added).

The Illinois Supreme Court in *Jeffries* explained that a murder trial, where the defendant asserts self-defense, comprises two stages: first, the jury must determine whether the State has proven the defendant guilty of first degree murder beyond a reasonable doubt. *Jeffries*, 164 Ill. 2d at 127–28, 646 N.E.2d at 598. If the jury so finds, then it reevaluates the evidence to determine whether the defendant acted "with lawful justification." *Id.* The defendant must prove, by a preponderance of the evidence, that he acted in self-defense by providing "some evidence" of the following elements: "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Id.* at 164 Ill. 2d at 128, 646 N.E.2d at 598. When the defendant claims self-defense, "the State must prove *more* than the three elements of first degree murder. The State must also prove that the murder was not carried out in self-defense, and that the defendant's use of force was not legally justified," and may do so by negating any one of the six elements of justifiable self-defense. *Jeffries*, 164 Ill. 2d at 127–28, 646 N.E.2d at 597–98.

The State bears the burden of proving that the defendant committed the act causing the death of another "without lawful justification." As *Jeffries* highlights, if jury finds that the State has proven the defendant guilty of first degree murder beyond a reasonable doubt, then, by

definition, the defendant has failed to convince the jury that he was "justified in the use of force" by a preponderance. *Jeffries*, 164 Ill. 2d at 128–29, 646 N.E.2d at 598 ("If the State fails to prove that the defendant was *not justified* in using the force that he used, then the jury must find the defendant not guilty of first degree murder and its deliberations end.") (emphasis in original). Only after the State has disproved at least one element of defendant's self-defense claim, and thus proven the elements of first-degree murder, does the jury consider whether the defendant has proven a mitigating factor, such as unreasonable self-defense, that would lower the offense to second degree murder. *Id.* The Illinois Supreme Court upheld this burden-shifting scheme as constitutional because it imposes on the prosecution the burden of proving the defendant guilty of all of the elements of first degree murder beyond a reasonable doubt. *Jeffries*, 164 Ill. 2d at 124, 646 N.E.2d at 596. That burden does not include a requirement that the State "prove the defendant lacked an unreasonable belief in the need for self-defense[.]" 164 Ill. 2d at 128, 646 N.E.2d at 598 (emphasis in original); *see also People v. Romero*, 387 Ill. App. 3d 954, 966–67, 901 N.E.2d 399, 410–11 (2nd Dist. 2008) ("Illinois's statutory scheme nowhere provides that the State must disprove a mitigating factor beyond a reasonable doubt after a defendant has established a mitigating factor by a preponderance of the evidence.").

At trial, Petitioner conceded that he had shot and killed Derrick Walton, and instead, asserted only that he acted with an *unreasonable* belief in the need for self-defense. (Trial Tr. 1 at 4:13–18, 5:1–18; App. Ct. Order at 3.) The trial court instructed the jurors, consistent with the law as laid out in *Jeffries*, that the State bore the burden of proving that Ojeda had killed the victim, that his conduct was intentional, and that he was not justified in using the force he used. The court instructed the jury, further, that if the State proved these things beyond a reasonable doubt, Ojeda could show he was liable only for second degree murder if he proved the mitigating factor of his unreasonable belief by a preponderance of the evidence. (Trial Tr. 3 at 101:1-202:6; 202:7-203:10.)

In rejecting Ojeda's argument that he had an unreasonable belief in the need for the use of deadly force, the Appellate Court began by observing that the State had defeated a self-defense claim by negating at least some of the six elements of "lawful justification." (App. Ct. Order at 11–12.) Thus, the court cited evidence "that defendant was the aggressor, that Derrick never threatened the defendant, and that Derrick retreated and did not have a weapon so there was no danger of immediate harm to the defendant." (App. Ct. Order at 12, 14.) At trial, the court observed, Petitioner testified that the greatest threat posed by Derrick was that they should end their dispute "one on one," a challenge that Petitioner interpreted as an invitation to a fist fight. (Trial Tr. 3 at 28:20–29:1; App. Ct. Order at 13.) Petitioner knew that Derrick Walton was unarmed (Trial Tr. 3 at 28:20–29:1), and every eyewitness, including Petitioner himself, testified that Derrick tried to run from Petitioner after he saw the gun, and that after shooting Derrick, Petitioner continued to fire at the crowd. (Trial Tr. 1 at 69:3–70:13, 71:10–72:6 (Dwayne Walton); 134:3–11, 135:5–136:5 (Yvette Smothers); 109:4–110:10, 109:13–17, 110:11–14 (Drujuan Young); Trial Tr. 3 at 19:21, 20:2, 34:16–24 (Petitioner).) In short, Petitioner was the aggressor. (App. Ct. Order at 13–14.) Petitioner claimed he was afraid that the crowd of people across the street would jump him (Trial Tr. 3 at 17:5–12), but he admitted that they were not close to him when he pulled out the gun (*id.* at 31:3–23), meaning that Petitioner was not in immediate danger. (App. Ct. Order at 13.) Finally, the court observed that Petitioner's own testimony was inconsistent with the claim that he believed, reasonably or not, that force was necessary: Ojeda testified that he pulled the gun out to "scare" Derrick, but thought the safety was on when he fired it, "impl[ying] that the shooting was an accident, not that he acted in self-defense." (App. Ct. Order at 14; *see* Trial Tr. 3 at 19:9–11.) There was, in the end, "no merit in defendant's claim that he mistakenly had a subjective belief that self-defense was justified in this case." (*Id.* at 13.)

The record supports the Appellate Court's conclusion that the State had proven Petitioner guilty of each element of first degree murder beyond a reasonable doubt. The jury's

conclusion that Petitioner had not established a mitigating factor was also supported by the evidence.  At a minimum, the Appellate Court's decision upholding the verdict was not objectively unreasonable.

**III.    Claim 2**

Next, Petitioner argues that he is entitled to habeas relief because the trial court erred in refusing to allow the defense expert to testify about Petitioner's mental condition at the time of the shooting.  (Am. Habeas Pet. at 5, 6(A).)  His mental state, Petitioner urges, was crucial to his defense theory that he acted based on an unreasonable belief in the need for self-defense, and the expert's testimony, given her expertise in psychology and neuropsychology, would have assisted the jury in deciding this issue. (*Id.*)  Respondent argues, first, that it is unclear from the record that the trial court did, in fact, exclude this testimony. (Answer at 20.)  But even assuming that happened, Respondent urges, Petitioner presented this issue only as a state evidentiary claim, not as an issue of federal or constitutional law, and therefore has both failed to exhaust, and procedurally defaulted this claim. (*Id.* at 21–22.)  Indeed, though he asserts that the evidence excluded was "critical to his defense theory," Petitioner does not identify any specific constitutional provision on which he relies for this claim. (Am. Habeas Pet. at 6(A).)  The court agrees with Respondent that Petitioner's claim is a non-cognizable, state law claim; even construing it as a claim of violation of due process, Petitioner did not fairly present it in state court proceedings, and therefore, it is procedurally barred.

Errors of state law are not cognizable on federal habeas review, and the federal courts defer to the state court's interpretation of state law, unless the errors "resulted in fundamental unfairness and consequently violate a petitioner's constitutional rights." *Lechner v. Frank*, 341 F.3d 635, 642 (7th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).  The Illinois law of evidence has "borrowed heavily" from federal law, but Illinois state court decisions interpreting that law remain an interpretation of state law. *See Britz v. Cowan*, 192 F.3d 1101, 1102–03 (7th Cir. 1999) (petitioner's claim that the state court improperly excluded expert

testimony under Federal Rule of Evidence 703 was not cognizable on habeas).  As the Seventh Circuit in *Britz* explained: "a state cannot expand federal jurisdiction by deciding to copy a federal law.  If it incorporates federal law into state law and then gets the federal law wrong, it has made a mistake of state law, which cannot be a basis for federal habeas corpus." *Id.* at 1103; *see also Moore v. Casperson*, 345 F.3d 474, 489 (7th Cir. 2003) ("On a petition for writ of habeas corpus, a federal court will not review evidentiary questions unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right.") (citation omitted); *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (same).

The trial court did, in fact, exclude expert testimony on the issue of Petitioner's mental state at the time of the shooting.  Petitioner's expert witness, Dr. Diane Goldstein, was permitted to testify that Petitioner suffers from generalized anxiety disorder and social phobia, and to explain these disorders and their symptoms. (Trial Tr. 1 at 4:17–21.)  But, citing two Illinois appellate court cases, *People v. Elder*, 219 Ill. App. 3d 223, 579 N.E.2d 420 (3d Dist. 1991) and *People v. Raines*, 354 Ill. App. 3d 209, 820 N.E.2d 592 (4th Dist. 2004), the trial court barred her from offering "her opinion of what [Petitioner's] mental state was at the time of the crime." (Trial Tr. 1 at 4:17–21.)

On direct appeal, Petitioner raised the same argument that he presents now—that the trial court erred when it excluded Dr. Goldstein's testimony about Petitioner's mental state at the time of the shooting (Pet'r's App. Br. at i–ii)—but he did not notify the court of the federal nature of his claim.  Instead, citing only state law, Petitioner argued that because of her expertise in psychology and neuropsychology and interviews with Petitioner, and because her knowledge and experience was not common, Dr. Goldstein's testimony would have assisted the jury in assessing the "critical" issue of his state of mind at the time of the shooting. (*Id.* at 22, 28.)  The Appellate Court disagreed, citing *Raines*, and observing that "the jury was capable of determining whether [Petitioner] believed that he was acting in self-defense at the time of the shooting without the assistance of Dr. Goldstein's opinion." (App. Ct. Order at 15.)  Petitioner

and three eyewitnesses (Dwayne Walton, Yvette Smothers, and Drujuan Young) all testified about "[Petitioner's] conduct and the circumstances surrounding the shooting," the court noted, and Petitioner himself testified about his own state of mind at the time of the shooting. (*Id.*) The Appellate Court cited only a single state law case, *Raines*, in its opinion. (*Id.* at 14–15.) Petitioner's leave to appeal to the Illinois Supreme Court, which raised the same issue, again cited only state law cases and did not reference federal law or the federal constitution. (Pet'r's PLA.)

On direct appeal, Petitioner cited state court cases, including *People v. Hawkins*, 296 Ill. App. 3d 830, 835, 696 N.E.2d 16, 20 (1st Dist. 1998), which he cited for the proposition that where the defendant's intent, motive or belief is at issue, the defendant is permitted to testify directly to this issue, and to provide additional evidence of the circumstances surrounding the charged offense. (Pet'r's App. Br. at 23.) As Petitioner noted, *Hawkins* relied on *People v. Quick*, 236 Ill. App. 3d 446, 453, 603 N.E.2d 53 (1st Dist. 1992), where the court concluded that exclusion of evidence "crucial to defendant's defense" violated the defendant's constitutional right recognized by the Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284 (1973) and *Washington v. Texas*, 388 U.S. 14 (1967). (*See* Pet'r's App. Br. at 23), citing *Quick*, 236 Ill. App. 3d at 453, 603 N.E.2d at 58.) In *Washington*, the Supreme Court held that "[t]he right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts," which "is a fundamental element of due process of law." 388 U.S. at 19. The Court echoed this sentiment in *Chambers*, holding that under the due process clause, a defendant in a criminal trial has "the right to a fair opportunity to defend against the State's accusations," including the right "to call witnesses in one's own behalf." 410 U.S. at 294.

This stray citation to *Quick*, without more, may be insufficient to put the state court on notice that Petitioner was claiming a violation of his federal constitutional rights. *See, e.g.*, *White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009) (holding that petitioner did not fairly present his

federal claim of violation of his right to have a jury venire selected from a fair cross section of the community, when, in state court, he cited an Illinois law and made "an innocuous reference" to his "right to an impartial jury"). The Appellate Court reasoned that the trial court did not err in excluding Dr. Goldstein's testimony because determining Petitioner's state of mind was within the common knowledge of the jurors. (App. Ct. Order at 15.) The court did not mention Petitioner's due process right to present a defense (*id.* at 14–15), nor did Petitioner himself identify the right to present a defense under the due process clause as the basis for his claim. (*See* Pet'r's App. Br. at 22–28; Reply Br. & Argument for Def.-Appellant in *People v. Ojeda*, No. 1-05-1652, Ex. H to Answer, hereinafter "Pet'r's Reply Br.," at 5–9; App. Ct. Order at 14–15; Pet'r's PLA; Am. Habeas Pet. at 6(A) (arguing only that "Ojeda is being held in violation of the Constitution of the United States.").)

Petitioner's failure to raise any federal issue in state court is significant for two reasons: first, it suggests that the decision to bar this aspect of Dr. Goldstein's testimony was a state court decision interpreting state evidentiary law, and as such is not cognizable on habeas. *See Britz*, 192 F.3d at 1102–03. Second, to the extent that Petitioner now claims that this decision violated some specific federal constitutional right, such as his due process right to present a defense, Petitioner has failed to exhaust, and has procedurally defaulted, the claim. *See White*, 588 F.3d at 1139.

If this claim were properly presented, this court is confident that the state courts' ruling was not "contrary to" or an "unreasonable application of clearly established federal law." 28 U.S.C. § 2254(d)(1). States generally "have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and the defendant's right to present a defense under the due process clause places is implicated only when those rules "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citations and quotations omitted). A court may exclude evidence where "its probative value is outweighed by

certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 Ill. at 326.  In Illinois, the defendant's state of mind generally is a question of fact for the jury. *Raines*, 354 Ill. App. 3d at 220, 820 N.E.2d at 601.  Expert testimony is appropriate only where the issue to be decided is outside the common knowledge of the jury, and the testimony would assist them. *People v. Becker*, 239 Ill. 2d 215, 235, 940 N.E.2d 1131, 1142 (2010).

At trial, the court did permit Dr. Goldstein to testify about the nature and symptoms of generalized anxiety disorder and social phobia, and to express her opinion that Petitioner suffered from these disorders. (Trial Tr. 1 at 3:12–5:4.)  And, the Appellate Court noted, the jury was capable of considering the unjustifiable self-defense issue without hearing expert testimony, as there was substantial evidence from which to assess Petitioner's state of mind: four witnesses, including Petitioner himself, testified about his "conduct and circumstances surrounding the shooting," and Petitioner specifically described his own state of mind at the relevant time. (App. Ct. Order at 14–15.)  Despite restrictions imposed by the trial court, Petitioner was able to present his theory of self-defense through his own testimony and through Dr. Goldstein's testimony that he suffered from two anxiety disorders that would cause him to misperceive threats.  The Appellate Court's conclusion—that the trial court did not err in excluding Dr. Goldstein's opinion concerning Petitioner's state of mind at the time of the shooting—was not "contrary to" or an "unreasonable application" of federal law.[5]

## IV.   Claim 3

Next, Petitioner argues that his federal constitutional rights were violated on post-conviction review.  He points to appellate counsel's failure to argue all of the issues presented in his original post-conviction petition, and to the Appellate Court's refusal to strike that brief filed

---

[5]     As noted *supra*, because Petitioner did not fairly present this claim as a federal, constitutional violation, the Appellate Court did not discuss federal law in its opinion.

by counsel and to permit Petitioner to proceed *pro se.* (Am. Habeas Pet. at 6, 6(A).) Respondent argues that defects in a post-conviction proceeding, including ineffective assistance of counsel, are not cognizable on habeas review. (Answer at 24–25.) The court agrees.

Habeas review is appropriate only where a person claims to be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner does not have a constitutional right to counsel in state post-conviction proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991), *superseded by statute on other grounds*, 28 U.S.C. § 2254(b)(2), and *holding modified on other grounds in Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ("This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). There is no procedural default of any ineffective assistance claim in this case, and Petitioner's post-conviction appellate counsel's alleged ineffectiveness for failing to raise additional issues on appeal is not a constitutional or federal claim cognizable on habeas review.

Petitioner's claim that he was denied access to the courts, to due process, and to equal protection, similarly fails to raise a cognizable claim on habeas. "No constitutional provision or federal law entitles [Petitioner] to any state collateral review," and therefore, "errors in state collateral review cannot form the basis for federal habeas corpus relief" "[u]nless state collateral review violates some independent constitutional right, such as the Equal Protection Clause." *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) (citing *Finley*, 481 U.S. at 557). Petitioner has not established that the post-conviction proceedings, specifically the Appellate Court's denial of his motion to strike and proceed *pro se*, violated any "independent constitutional right," so this claim, too, is not cognizable on habeas.

The right of access guarantees "the right of an individual, whether free or incarcerated, to obtain access to the courts without undue interference." *Snyder v. Nolen*, 380 F.3d 279, 291

(7th Cir. 2004).  The right of access does not support a standalone claim, however; instead, "the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury to being shut out of court" because "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002).  Petitioner here does not identify a claim underlying his right of access argument, apart from an undeveloped contention that the Appellate Court also violated his rights to equal protection and due process.

Thus, Petitioner's due process challenge is limited to his inability to "contest" his attorney's decision to raise only a single issue on appeal.[6]  (Points & Authorities in Supp. of Traverse [37], hereinafter "Traverse," at 6–8.)  A person's constitutional right to due process in post-conviction proceedings "is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Dist. Att'y's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (holding that state discovery process governing access to DNA during post-conviction

---

[6] Petitioner claims he "forfeited" additional issues raised in his original post-conviction petition because his attorney failed to raise them—specifically, claims that he was denied a fair trial at the jury selection stage and in the prosecutor's closing, and that trial counsel was ineffective. (*See* Pet'r's Post-Conviction Pet. at 3, 7–8, 14, 36; *see also* Pet'r's Mot. to Strike at 2.)  Petitioner has not renewed those arguments in his federal petition, and none of them appear to have merit.  In dismissing his challenge to jury selection (that trial counsel asked just one question about juror prejudice against gangs), the Circuit Court concluded that the question was adequate and that Petitioner failed to explain what additional questions were necessary. (Cir. Ct. Post-Conviction Order at 5.)  Second, Petitioner challenged the prosecutor's statements in closing: (1) "How do you get second degree murder out of that? How do you get self-defense out of that? That's not right. That can't be right under the law," and (2) "only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them" (referring to Petitioner and defense expert Dr. Goldstein).  Those statements were, the Circuit Court concluded, arguments "permitted within the latitude" of closing arguments. (*Id.* at 6–7.)  And, as discussed *infra*, Petitioner's additional claim that the prosecutors made other inappropriate statements during closing argument is meritless. (*Id.* at 7–13; *see also infra* Part IV.)  Finally, Petitioner argued that trial counsel was ineffective for failing to impeach the stipulated testimony of a State's witness, and for making prejudicial statements concerning gangs during opening.  The Circuit Court reasonably concluded that trial counsel's strategic decisions, even if erroneous, did not prejudice him.  (*Id.* at 15–17.)

proceedings did not violate the due process clause). "The State . . . has more flexibility in deciding what procedures are needed in the context of postconviction relief," and "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. Here, the Appellate Court did not issue a written opinion concerning its refusal to permit Petitioner to proceed *pro se* (Order in *People v. Ojeda*, No. 1-09-0676 (Ill. App. Ct. 1st Dist. May 7, 2010)), but under Illinois law, Petitioner has no right to file a *pro se* brief when represented by counsel. *See People v. McDonald*, 168 Ill. 2d 420, 435, 660 N.E.2d 832, 838 (1995) (considering arguments raised in defendant's *pro se* brief only because defendant was on death row), *abrogated on other grounds by People v. Clemons*, 360 Ill. Dec. 293, 968 N.E.2d 1046 (Ill. 2012). While the decision effectively barred Petitioner from raising other issues, the record shows he had chosen to be represented by counsel on appeal,[7] and when represented, did not have the right to have every issue raised on appeal, or to file a *pro se* motion. After Petitioner requested appointed counsel, and counsel and the State filed opening briefs, the Appellate Court's decision denying Petitioner's motion to file a new appellate brief and proceed *pro se* did not render the post-conviction review proceedings "fundamentally inadequate to vindicate [Petitioner's] . . . substantive rights."

Petitioner also claims that he was denied equal protection when the Appellate Court denied his motion to proceed *pro se* because he is "of Latin American heritage." (Traverse at 11–12.) But Petitioner offers no evidence that his national origin had anything to do with the ruling, and this unsupported claim cannot serve as the basis for federal habeas review of his post-conviction proceedings.

---

[7] Petitioner requested the assistance of an attorney when he filed his post-conviction petition, and again on appeal. (*See* Mot. for Appointment of Counsel *in* Pet'r's Post-Conviction Pet.; Mot. for Appointment of Counsel *in* Cir. Ct. Post-Conviction Order.) Only after Petitioner's appellate counsel filed its opening appellate brief, and the State responded, did Petitioner seek to proceed *pro se*.

Finally, the court observes that Petitioner did appear to have meaningful access to the Appellate Court on post-conviction review. He was represented by counsel at his own request and has not shown that any "independent constitutional right" was violated during post-conviction proceedings. His dissatisfaction with the result of those proceedings does not support a claim for habeas relief.

## V.    Claim 4

In his last claim, Petitioner asserts that counsel on direct appeal was ineffective for failing to raise a claim "of prosecutorial misconduct based on the prosecutor's inflammatory and prejudicial statements during closing arguments" as plain error. (Am. Habeas Pet. at 6.) Respondent acknowledges that Petitioner exhausted this claim on post-conviction review, but argues that the Appellate Court's decision affirming summary dismissal of this claim was not contrary to, or an unreasonable application of, clearly established federal law. (Answer at 27.) Again, the court agrees.

Petitioner does not specifically identify the alleged "inflammatory and prejudicial statements," but appears to have exhausted this claim in his post-conviction petition by identifying three types of comments made by the prosecutors during closing arguments—(1) repeatedly referring to Petitioner's gang affiliation; (2) vouching for the credibility of witnesses by identifying "truth detector[s]" within their testimony; and (3) "injecting" their personal opinions and "aligning themselves with the jury" by referring to what "we know" based on witness testimony, or to what the witnesses "tell us."  (Pet'r's Post-Conviction App. Br. at 14; *see also* Pet'r's Post-Conviction Pet at 46–47; Pet'r's Post-Conviction PLA at 2.)  The Circuit Court dismissed the claim, citing *Strickland v. Washington*, 466 U.S. 668 (1984) and Illinois cases, and reasoning that because the prosecutorial misconduct claim, and others identified by Petitioner, were "without merit," Petitioner did not show that he was prejudiced by his appellate counsel's failure to raise these claims. (Cir. Ct. Post-Conviction Order at 18.)

The Appellate Court affirmed. When a post-conviction petition alleges ineffective assistance of counsel, the court reasoned, it must be at least "arguable" that "counsel's performance fell below an objective standard of reasonableness" and that "the defendant was prejudiced." (App. Post-Conviction Order at 5) (citing *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009), which relied on *Strickland*.) Appellate counsel is not required to "raise every conceivable issue on appeal, and an attorney who refrains from briefing issues without merit is not incompetent." (*Id.*) In evaluating whether a prosecutor's closing arguments are grounds for a new trial under Illinois law, the court stated, it must consider "whether the prosecutors' comments 'engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them.' " (*Id.* at 6) (quoting *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007).)

Under that standard, any challenge to the prosecutors' comments would fail, the Appellate Court concluded. First, because Petitioner's gang affiliation was relevant, the prosecutor's repeated references to gang membership in closing were not improper. (App. Post-Conviction Order at 8–9.) Petitioner also argued that the prosecutor argued facts not in evidence when he said that Petitioner and his "fellow Dragon gangbangers" were looking for "trouble" with members of the Gangster Disciples gang, but the Appellate Court held that this statement was "not completely without evidentiary support," and noted that the trial court's instructions that closing arguments are not evidence cured any possible error. (*Id.* at 9–10.) It is impermissible for a prosecutor "to personally vouch" for a witness's credibility, but the Appellate Court reasoned that a prosecutor could, under Illinois law, make comments on a witness's credibility that are based on evidence or reasonable inference. (*Id.* at 10.) The latter, the court concluded, is what the prosecutor was doing in closing when he referred to certain "truth detector[s]" within the state's witnesses' testimony. (*Id.*) The prosecutor's statement "I think Yvette was right on with what happened" was not a *per se* error, nor did the prosecutors improperly align themselves with the jury by using common phrases describing what "we know"

from witness testimony, or referring to what witnesses "tell us" as part of their closing, the court concluded. (*Id.* at 11.)   Indeed, defense counsel, too, used the expression "we know" concerning the testimony in his own closing. (*Id.*)

Second, even assuming that prosecutorial misconduct had occurred, the court found that it would not have been reviewable as "plain error" on direct appeal, the prosecutor's comments were not serious, and the evidence at trial was not close. (*Id.* at 12) (citing *People v. Herron*, 215 Ill. 2d 167, 186–87, 830 N.E.2d 467, 479 (2005).)   In short, the court concluded, Petitioner could not establish any prejudice from appellate counsel's failure to challenge the closing on direct appeal.   (*Id.*)

That decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.   Petitioner does have a right to effective assistance of counsel on direct appeal, *Evitts v. Lucey*, 469 U.S. 387, 396 (1985), and *Strickland*'s two-prong standard applies, that is, Petitioner must show that counsel's performance fell below an objective standard of reasonableness causing prejudice. *People v. Harris*, 206 Ill. 2d 1, 34, 794 N.E.2d 314, 335 (2002) (citing *Strickland*).   The bar for such a showing is a high one; as explained in *Smith v. Robbins*, though failure to raise a particular claim may support an ineffective assistance claim, it is generally "difficult to demonstrate that counsel was incompetent." 528 U.S. 259, 288 (2000) (citing, as an example, *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986): "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

The Appellate Court reasonably applied the *Strickland* standard in holding appellate counsel's failure to raise an unpersuasive claim of prosecutorial misconduct claim was not objectively unreasonable.   Moreover, because the issue had not been properly preserved, counsel would have been permitted to argue it on direct appeal only if there were "plain error"— requiring a showing that "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Herron*, 215 Ill. 2d at 186–

87, 830 N.E.2d at 479. The Appellate Court reasoned that the evidence was neither close nor the errors serious, and therefore, that counsel would not have been permitted under Illinois law to make the prosecutorial misconduct argument on direct appeal. Under these circumstances, the Appellate Court did not unreasonably apply *Strickland* when it held that Petitioner was not prejudiced by his counsel's failure to raise the claim.

## CONCLUSION

The court denies Petitioner's habeas petition. Because the court concludes reasonable jurists would not find the conclusions stated here debatable, the court declines to issue a certificate of appealability.

ENTER:

Dated: June 9, 2014

REBECCA R. PALLMEYER
United States District Judge